**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3545-19
                A-3554-19

IN THE MATTER OF THE
ADOPTION OF AMENDMENTS
TO N.J.A.C. 7:9B.

_____

Argued May 18, 2022 – Decided July 20, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the New Jersey Department of Environmental Protection.

George J. Tyler and Margaret B. Carmeli argued the cause for appellant Raritan Township Municipal Utilities Authority in A-3545-19 (Law Office of George J. Tyler, PC and Offit Kurman, attorneys; George J. Tyler, of counsel and on the briefs; Margaret B. Carmeli and Matthew J. Krantz, on the briefs).

Michael J. Gross argued the cause for appellants Township of Raritan and Hunterdon County in A-3554-19 (Giordano, Halleran & Ciesla, attorneys; Michael J. Gross, Paul H. Schneider, David J. Miller and Linda M. Lee, on the briefs).

David A. Tuason, Assistant Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Matthew J. Platkin, Acting

Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; David A. Tuason, on the brief).

Neil Yoskin argued the cause for amici curiae New Jersey Business & Industry Association, The New Jersey Chapter of NAIOP, The Commercial Real Estate Development Association, New Jersey Builders Association, and National Association of Home Builders (Cullen and Dykman, LLP, attorneys; Neil Yoskin, of counsel and on the briefs; Amie Kalac, on the briefs).

William D. Bittinger argued the cause for amici curiae, Raritan Headwaters Association, The Watershed Institute and New Jersey Highlands Coalition (Eastern Environmental Law Center, attorneys; William D. Bittinger and Daniel Greenhouse, on the brief).

Lewis Goldshore argued the cause for amicus curiae New Jersey Farm Bureau.

Diane Alexander argued the cause for amicus curiae Borough of Flemington (Maraziti Falcon, LLP, attorney; Diane Alexander, on the brief).

PER CURIAM

These consolidated appeals challenge the adoption of amendments to the Surface Water Quality Standards (SWQS), N.J.A.C. 7:9B-1.4 and 1.15, upgrading the designation of approximately 600 river miles of the South Branch Raritan River and its tributaries to Category One (C1) antidegradation status by respondent New Jersey Department of Environmental Protection (DEP or the

A-3545-19

Department).  C1 designated waters are protected against measurable change to existing water quality because of their exceptional ecological significance, among other reasons.  To maintain existing water quality, the C1 antidegradation designation imposes restrictions on properties adjacent to the designated waterways, including restricting development and establishment of sewer service in a 300-foot riparian zone adjacent to C1 waters.  C1 designation also restricts expansion of existing wastewater treatment plants that discharge directly into, or upstream from, C1 waters.  We affirm.

The Raritan Township Municipal Utilities Authority (RTMUA), appellant in No. A-3545-19, operates a wastewater treatment facility that discharges into the South Branch Raritan River, just upstream of a waterbody segment subject to the C1 upgrade.  The Township of Raritan (Township) and Hunterdon County (County), appellants in No. A-3554-19, have multiple surface waterbodies subject to the C1 upgrade located within their geographical boundaries and are thereby affected by the riparian zone restrictions.  As customers of RTMUA's wastewater treatment facility, they are affected by the expansion restrictions placed upon that facility.

Collectively, appellants contend that the DEP's adoption of the amendments, specifically its amendment of N.J.A.C. 7:9B-1.15, was

3

procedurally flawed and violated the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15. Also, RTMUA contends that the C1 antidegradation designation for the South Branch Raritan River (Three Bridges) waterbody segment (Three Bridges Segment) is arbitrary, capricious, and unreasonable because it is not supported by sufficient scientific data. Ten amici curiae have respectively voiced support for the positions taken by appellants or the DEP.

At issue in these appeals is whether the DEP substantially complied with the procedural requirements for rulemaking under the APA in amending N.J.A.C. 7:9B, and whether the C1 antidegradation designation for the Three Bridges Segment is supported by substantial credible evidence in the record.

We first describe the relevant procedural history. On March 4, 2019, the DEP proposed amendments to the SWQS at N.J.A.C. 7:9B-1.4 and 1.15, "to upgrade 749 river miles to Category One (C1) antidegradation designation based on exceptional ecological significance and exceptional fisheries resource." 51 N.J.R. 308(a) (proposed Mar. 4, 2019). On April 8, 2019, the DEP held a public hearing on its proposal. In response to requests from appellants and others, the DEP extended the May 3, 2019, deadline for submission of public comments to June 3, 2019.

On March 4, 2020, the DEP adopted the proposed amendments "with non-substantial changes," reducing the river miles subject to the upgraded C1 antidegradation designation from about 749 to approximately 600, after reviewing more recent data.  52 N.J.R. 711(a) (proposed Apr. 6, 2020).  On April 6, 2020, the DEP published a notice of adoption of the amendments in the New Jersey Register.  Ibid.

On May 19, 2020, RTMUA filed a notice of appeal challenging the rule adoption.  The following day, the Township and County jointly filed a notice of appeal challenging the rule adoption.  We granted the DEP's motion to consolidate the appeals.

We granted motions by the New Jersey Business & Industry Association (NJBIA), New Jersey Chapter of NAIOP, Commercial Real Estate Development Association, New Jersey Builders Association (NJBA), National Association of Home Builders (collectively the Business amici curiae), as well as the New Jersey Farm Bureau and the Borough of Flemington (Flemington) to appear as amici curiae.

We also granted motions by Raritan Headwaters Association (RHA), The Watershed Institute, and New Jersey Highlands Coalition (collectively the Environmental amici curiae) to appear as amici curiae.

The Statutory and Regulatory Background

The DEP is authorized by statute "to 'formulate comprehensive policies for the conservation of the natural resources of the State [and] the promotion of environmental protection[.]'" In re N.J.A.C. 7:15-5.24(b), 420 N.J. Super. 552, 558 (App. Div. 2011) (first alteration in original) (quoting N.J.S.A. 13:1D-9). To understand the significance of the DEP's amendment of the SWQS and appellants' contentions in their proper context, we review the Clean Water Act (CWA), 33 U.S.C. §§ 1251 to 1389, along with two state laws implementing CWA mandates: the Water Pollution Control Act (WPCA), N.J.S.A. 58:10A-1 to -73, and the Water Quality Planning Act (WQPA), N.J.S.A 58:11A-1 to -16.

The Clean Water Act

"The overriding goal of the Clean Water Act 'is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" In re Issuance of Permit by Dep't of Env't Prot. to Ciba-Geigy Corp., 120 N.J. 164, 174 (1990) (quoting 33 U.S.C. § 1251(a)). "Under the Clean Water Act (CWA), the discharge of pollutants is illegal." Del. Riverkeeper Network v. N.J. Dep't of Env't Prot., 463 N.J. Super. 96, 106 (App. Div. 2020) (citing 33 U.S.C. § 1311). The United States Environmental Protection Agency (EPA) is charged with enforcing the CWA. However, the CWA allows "EPA-approved" states,

including New Jersey, to "issue permits exempting a discharge from this prohibition" so long as water quality standards are maintained. Ibid. "[S]tate-based water quality standards," such as SWQS, "are one of two 'water quality measures' required by" the CWA. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 415, 436 (2004). As explained by the Court:

> "Effluent limitations" are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources. "[W]ater quality standards" are, in general, promulgated by the States and establish the desired condition of a waterway. These standards supplement effluent limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels."
>
> [Ibid. (alteration in original) (citations omitted) (quoting Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992)).]

"Individual states are given primary responsibility for developing and adopting [SWQS]" while the EPA "oversee[s] and approv[es] state water quality standards." 51 N.J.R. at 340. The DEP notes the EPA's July 29, 2020 approval of the amendments at issue.[1] The EPA's approval is not disputed by appellants

---

[1] See Water Quality Standards Regulations: New Jersey, U.S. EPA, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-new-jersey (June 17, 2022).

or amici.  We take judicial notice of the approval pursuant to N.J.R.E. 201(a) and N.J.R.E. 202(b).  See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 201 (2021-2022) (noting that regulations and determinations of all federal agencies are judicially noticeable under N.J.R.E. 201(a)).

The Water Pollution Control Act & Water Quality Planning Act

The DEP promulgates SWQS, N.J.A.C. 7:9B-1.1 to -15, pursuant to the WPCA and WQPA, which were enacted to restore, enhance, and maintain the State's water quality in accordance with the federal mandate.  N.J.S.A. 58:10A-2; N.J.S.A. 58:11A-2; Vi-Concrete Co. v. N.J. Dep't of Env't Prot., 115 N.J. 1, 7 (1989); N.J. Builders Ass'n v. Fenske, 249 N.J. Super. 60, 63-65 (App. Div. 1991) (discussing the 1977 enactment of WPCA and WQPA).

The WPCA "provides for restoration, enhancement and maintenance of the State's waters . . . and set[s] up administrative controls respecting various treatment facilities."  In re N.J.A.C. 7:15-5.24(b), 420 N.J. Super. at 558 (second alteration in original) (quoting Fenske, 249 N.J. Super. at 64).  Consistent with CWA mandates, the WPCA "makes unlawful the discharge of any pollutant into the State's surface or ground waters without either a valid New Jersey Pollutant Discharge Elimination System (NJPDES) permit or an exemption from the

permit requirement." In re NJPDES Permit No. NJ0025241, 185 N.J. 474, 478 (2006) (citing N.J.S.A. 58:10A-6(a)). NJPDES permit holders must "achieve effluent limitations . . . as may be necessary to meet water quality standards[.]" N.J.S.A. 58:10A-6(f)(1).

In turn, the WQPA "provides for the restoration and maintenance of water quality in this State, including a planning process to control and maintain water quality." In re N.J.A.C. 7:15-5.24(b), 420 N.J. Super. at 558. As part of that planning process, the DEP is required to "[d]evelop a statewide implementation strategy to achieve the water quality standards," which includes: "(1) the determination of effluent limitations and schedules of compliance at least as stringent as those required by" federal law and "(2) the determination of the total maximum daily load for pollutants necessary to meet the water quality standards[.]" N.J.S.A. 58:11A-7(c).

The Surface Water Quality Standards

To achieve these laudable goals, the DEP has adopted comprehensive surface water quality standards. The DEP "set[s] water quality standards by first assigning a 'use' to a navigable body of water, such as propagation of fish or recreational purposes, and then developing criteria to protect that use and ensure that higher quality waters do not degrade to the minimally accepted standard."

9

Del. Riverkeeper, 463 N.J. Super. at 106. Accordingly, the SWQS "set forth designated uses, use classifications, and water quality criteria for the State's waters based upon such uses" as well as "the Department's policies concerning these uses, classifications and criteria." N.J.A.C. 7:9B-1.4.

The use classifications include FW1 (freshwaters "not subject to any man-made wastewater discharges") and FW2 ("all other freshwaters, except Pinelands waters"). 51 N.J.R. at 309; see also N.J.A.C. 7:9B-1.4 (defining the use classifications). The Three Bridges Segment is classified as FW2. 51 N.J.R. at 324. The designated uses in FW2 waters are:

> 1. Maintenance, migration and propagation of the natural and established biota;
>
> 2. Primary contact recreation;
>
> 3. Industrial and agricultural water supply;
>
> 4. Public potable water supply after conventional filtration treatment . . . and disinfection; and
>
> 5. Any other reasonable uses.
>
> [N.J.A.C. 7:9B-1.12(c).]

The surface water quality criteria for FW2 waters, generally expressed as maximum concentration limits for specific pollutants, are set forth in N.J.A.C. 7:9B-1.14(d) through (f). "Water quality criteria specify the acceptable levels

of individual pollutants that, if met, will generally protect the designated use of the water."  51 N.J.R. at 317.

The DEP's "Division of Water Monitoring and Standards collects water samples at monitoring stations located throughout the State and compares these monitoring results with the adopted water quality criteria as described in the Integrated Water Quality Monitoring and Assessment Methods Document." Ibid.  It "publishes its findings in the Integrated Water Quality Monitoring and Assessment Report" (Integrated Report).  Ibid.  "If monitoring and assessment indicate that a waterbody is impaired by one or more pollutants, it is placed on the Impaired Waters List, also known as the 303(d) List."  Ibid.  The DEP "is required to develop a strategy" for impaired waterbodies "that will lead to attainment of water quality criteria."  Ibid.  The 303(d) List is published as part of the Integrated Report.  52 N.J.R. 1971(a) (Oct. 19, 2020).

Additionally, as mandated by the CWA, "the SWQS establish antidegradation policies for all intrastate surface waters" to protect and maintain water quality as detailed at N.J.A.C. 7:9B-1.5(d).  51 N.J.R. at 309; see In re Freshwater Wetlands Prot. Act, 180 N.J. at 438; Ciba-Geigy, 120 N.J. at 176-77 (discussing the antidegradation policies).  "[T]he State antidegradation policy

must be at least as stringent as the federal program, and is subject to EPA approval." In re Freshwater Wetlands Prot. Act, 180 N.J. at 437.

"There are three tiers of antidegradation designations: Outstanding national resource waters (ONRW), Category One (C1) waters, and Category Two (C2) waters," which are defined in N.J.A.C. 7:9B-1.4.  51 N.J.R. at 309. At issue in this appeal is the C1 antidegradation designation of the subject waterways and its ramifications.

"Category One waters are protected from any measurable change to existing water quality because of their exceptional ecological significance," among other reasons.  Ibid.; see N.J.A.C. 7:9B-1.5(d)(2)(iii) (discussing C1 antidegradation policy).  "Exceptional ecological significance" is defined as:

> 1. Waterbodies with suitable habitat verified by the Department to support Bog Turtle, Brook Floater, Dwarf Wedgemussel, Eastern Pondmussel, Eastern Lampmussel, Green Floater, and/or Triangle Floater and documented occurrence(s) of at least one of these species verified by the Department for inclusion in the Biotics database; or
>
> 2. A waterbody supporting an exceptional aquatic community as demonstrated by a nonimpaired benthic macroinvertebrate community as measured by the Department's Rapid Bioassessment Protocol (see http://www.state.nj.us/dep/wms/bfbm/rbpinfo.html) and at least two of the following factors:

i. Optimal habitat as measured by the Department's Stream Habitat Assessment (see http://www.state.nj.us/dep/wms/bfbm/rbpinfo.html);

ii. Excellent fish community as measured by the Fish Index of Biotic Integrity [FIBI] (see http://www.state.nj.us/dep/wms/bfbm/fishbi.html);

iii. Water quality data that demonstrates compliance with aquatic life criteria pursuant to N.J.A.C. 7:9B-1.14(d) for dissolved oxygen, temperature, total phosphorus, and total suspended solids; or

iv. Impervious surface that is:

(1) Less than two percent for a HUC 14[2] of less than five square miles; or

(2) Less than or equal to [ten] percent for a HUC 14 of greater than or equal to five square miles.

[N.J.A.C. 7:9B-1.4.]

Overview of the Proposal

The DEP's rule proposal began with a summary statement that explained the purpose of amending the SWQS set forth in N.J.A.C. 7:9B was to upgrade 749 river miles to a C1 antidegradation designation based on exceptional

---

[2] "HUC 14" stands for "hydrologic unit code 14." N.J.A.C. 7:9B-1.4. It "means the drainage area for a particular receiving surface water body, also known as a subwatershed, . . . delineated . . . by the United States Geological Survey." Ibid.

ecological significance and/or exceptional fisheries resources. 51 N.J.R. at 309. Appellants challenge the claimed exceptional ecological significance of the waterbody segment at issue. Prior to its publication, the DEP presented the proposal to stakeholders including "representatives from environmental groups, regulated entities, municipal and county planning boards, academia, and Federal regulators," at a meeting in January 2019. Ibid.

The proposal highlighted the significance of the C1 antidegradation designation. Ibid. It explained that "[i]t is generally more cost effective to prevent degradation through water quality protections, such as upgrading waters to Category One designations, than to restore the waters after they become degraded," because restoration of surface waters "is a difficult, time consuming, and expensive process." Ibid.

Next, the proposal identified and described "[t]he waters proposed for upgrade and the basis for [the] upgrade[.]" Ibid. The narrative descriptions of the waterbody segments contained "locally familiar" place names "extracted from the United States Geographical Survey (USGS) topographic maps" and were "shown in the rule text in parenthesis to aid the user in identifying the referenced waterbody." 51 N.J.R. at 309-37. The proposal also contained tables listing each waterbody segment, its length in river miles, and identified the

municipalities, counties, and wastewater discharge facilities potentially affected by the C1 upgrade.  51 N.J.R. at 310-37.

The proposal stated that mapping information for the affected waterways was available "as a Geographic Information System (GIS) coverage at https://www.nj.gov/dep/gis" and that "a digitized version of proposed stream segments can be seen in an interactive map at https://www.state.nj.us/dep/wms/bears/swqs-rules.htm."  51 N.J.R. at 309-10.[3] The March 2019 interactive map, titled "2019 Proposed Category One Water," permitted the public to click on five regions, including the Raritan region, to launch region-specific maps.[4]  The region-specific map of the Raritan region depicts existing C1 waters in pink, proposed C1 waters in dark blue, and all other existing waters in light blue.  It includes municipal and county boundary lines but lacks street names or landmarks.  From there, clicking on the "S Branch Raritan River" link on the Raritan region map launches another map offering a

---

[3]  "The GIS system is computer-based and uses digital mapping information." In re N.J.A.C. 7:15-5.24(b), 420 N.J. Super. at 561 n.1.  It depicts features such as land use and land cover, roads, streams, and wetland coverages, which are "stored independently as a separate coverage or layer."  Ibid.  The GIS data is accessed through the NJ-GeoWeb application.

[4]  The record includes the March 2019 interactive map and May 2019 maps.

closer look at that stream segment depicting the waterways in the colors described above as well as state and county roads in orange.

After RTMUA filed requests under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, the DEP posted more detailed maps on its website during the public comment period that depicted the HUC 14 watershed boundary lines, affected tributaries, municipal and county boundaries, roads, and certain landmarks. 52 N.J.R. at 732. The May 2019 maps color-coded protected tributaries in green and HUC 14 watershed boundaries in yellow, and included certain landmarks such as parks and golf courses. Local streets are shown in light grey but without street names. The parties acknowledge that the May 2019 maps identified the affected tributaries through color coding.

The proposal included impact statements addressing the following projected impacts: social, economic, environmental, jobs, agriculture industry, housing affordability, smart growth development, racial and ethnic community criminal justice and public safety, along with a federal standards analysis and a regulatory flexibility analysis. 51 N.J.R. at 338-42. Appellants and amici challenge the sufficiency of the impact statements. For context, we pause here to highlight the projected major economic impact.

16

The Economic Impacts of the C1 Upgrades

The DEP's economic impact statement indicted that the major economic impacts of the C1 upgrades necessary to maintain water quality involve: (1) development restrictions; (2) exclusions from sewer service; and (3) restrictions on new wastewater treatment plants and existing wastewater treatment plants that wish to expand their capacity. 51 N.J.R. at 338-39.

Regarding the development restrictions and related exclusions from sewer service, the proposal stated:

> The Flood Hazard Area Control Act [FHACA] Rules, N.J.A.C. 7:13, and the Water Quality Management Planning Rules, N.J.A.C. 7:15, respectively, establish and restrict development and/or sewer service for development within the 300-foot riparian zone along any regulated water designated as a Category One water, and all upstream tributaries situated within the same HUC-14 watershed of such Category One waters . . . . Therefore, the designation of new Category One waters . . . will result in additional lands being restricted from development and excluded from sewer service.
>
> [51 N.J.R. at 338.]

A riparian zone is defined as "the land and vegetation within and adjacent to a regulated water[.]" N.J.A.C. 7:13-1.2. The following activities are regulated under FHACA rules when undertaken within a riparian zone:

> 1. The alteration of topography through excavation, grading and/or placement of fill;

2. The clearing, cutting, and/or removal of vegetation in a riparian zone. Areas containing vegetation for a portion of the year, such as agricultural areas that are periodically plowed and cultivated, are considered vegetated for the purposes of this chapter;

3. The creation of impervious surface;

4. The storage of unsecured material;

5. The construction, reconstruction, repair, alteration, enlargement, elevation, or removal of a structure; and

6. The conversion of a building into a single-family home or duplex, multi-residence building, or critical building.

[N.J.A.C. 7:13-2.4(a).]

"Any activity within a riparian zone or flood hazard area requires a flood hazard area approval" through a permitting process conducted pursuant to FHACA rules. 51 N.J.R. at 339. The DEP acknowledged there are application costs associated with this process for property owners (including municipalities), and applicants "may have to spend more time and resources preparing an application" to satisfy heightened requirements aimed at mitigating "the potential for increased downstream flooding, and the damages to the environment that can be caused by such flooding." Ibid.

The DEP maintains that most of the communities surrounding the proposed C1 waters are already required to use septic systems in place of sewer

service pursuant to WQPA planning area requirements.[5]  51 N.J.R. at 338.

Therefore, "potential economic impacts from the Category One upgrades are

reduced." Ibid.  However, the DEP acknowledged that "there has been a recent

interest in developing new sewage treatment plants for discharges to streams or

waterways in order to accommodate properties that are currently discharging

waste to failing septic systems."  51 N.J.R. at 338.

In that regard, the DEP further acknowledged that "[t]he siting of a new

wastewater treatment plant with an NJPDES permitted surface water discharge

to a proposed Category One water would face significant economic and

engineering challenges to meet the no measurable change [to water quality]

Category One requirement."  51 N.J.R. at 338.  This is because such "facilities

may have to provide a higher level of pollutant removal by building additional

treatment units . . . or changing to a treatment technology that can remove more

---

[5] The WQPA requires "creation of wastewater treatment management planning areas" and implementation of "areawide waste treatment management plans within each of the planning areas[.]"  In re N.J.A.C. 7:15-5.24(b), 420 N.J. Super. at 559.  Certain planning areas are designated "as sewer service areas" in which treated wastewater is discharged into surface water or groundwater while others are designated as areas with "individual subsurface disposal systems (ISSDSs)," or septic systems, "that discharge directly into groundwater." Id. at 559-60. "All projects and activities affecting water quality must be developed and conducted in a manner consistent with the areawide plan adopted for that area." Ibid.

pollutants" that could increase both capital and annual operating costs. 51 N.J.R. at 339.

Similarly, existing wastewater treatment facilities such as RTMUA, which propose an "expanded activity that has the potential to lower water quality" will be required to "include effluent limitations that will ensure that existing water quality will be maintained" and will face increased capital and annual operating costs to meet that requirement. 51 N.J.R. at 338-39. The DEP recognized that "new or increased discharge" into a C1 waterbody "may not be possible in all situations." 51 N.J.R. at 339.

The Public Hearing and Comment Period

Twenty-four people testified at the public hearing on the proposal. The DEP received 1,753 written comments on the proposal, including comments from RTMUA, the Township, the County, The Watershed Institute, New Jersey Highlands Coalition, Flemington, NJBIA, NJBA, New Jersey Chapter of NAIOP, and New Jersey Farm Bureau. 52 N.J.R. at 712.

The majority of those who testified supported the amendments, including representatives from RHA and the New Jersey Highlands Coalition. However, counsel for RTMUA voiced concerns about "an incomplete administrative record," which necessitated filing an OPRA request for data upon which the DEP

relied, "inadequate time provided for public comment," and "an absence of meaningful impact assessment." The NJBIA added that the DEP did not adequately address the economic impacts associated with the C1 upgrade, including the 300-foot riparian zone buffers and exclusions from sewer service, and did not sufficiently involve stakeholders in the rulemaking process.

Many of the written comments raised similar and overlapping procedural and substantive objections to the proposal. The major areas of concern were the proposal did not comply with the APA's procedural requirements, specifically the requisite notice and impact statements; and the Three Bridges Segment did not satisfy the regulatory criteria for a C1 antidegradation designation.

The Three Bridges Segment

This appeal primarily focuses on the Three Bridges Segment, which stretches from the County Route 613 bridge on Main Street between Raritan and Readington Townships, to the confluence of the Neshanic River, including all tributaries, classified as FW2-NT [non-trout waters] (C1). 51 N.J.R. at 324-25, 331, 347.

Table E of the proposal indicated that this segment, as initially proposed, was 33.4 river miles long, located in Somerset and Hunterdon counties, in the municipalities of Branchburg, Hillsborough, Raritan, and Reading. 51 N.J.R. at

21

331. Table E identified RTMUA as a potentially affected wastewater discharge facility.[6]  Ibid.  The segment is shown on the DEP's March 2019 interactive map and May 2019 maps.

The DEP sought to upgrade this segment to C1 antidegradation designation upon concluding that it supported "an exceptional aquatic community" as defined at N.J.A.C. 7:9B-1.4, based on a demonstrated nonimpaired macroinvertebrate community coupled with an optimal instream habitat and a low percentage of impervious surface.  51 N.J.R. at 325.  As part of its scientific analysis, the DEP relied upon data it collected as well as data collected by RHA.

The Nonimpaired Benthic Macroinvertebrate Community

The proposal explained that "[t]he biological health of New Jersey's non-tidal wadeable streams is assessed based upon the resident instream benthic macroinvertebrate community."  51 N.J.R. at 315.  "Benthic macroinvertebrates are primarily benthic (bottom-dwelling) faunae easily viewed with the naked eye," including insects, worms, mollusks, and crustaceans.  Ibid.  "Their

_____

[6]  Although the County objected to the C1 upgrade of four additional stream segments during the public comment period, it does not challenge the basis for those upgrades on appeal.  Rather, it contends that the DEP failed to comply with the APA and thus the amendments in their entirety "must be invalidated."

22

presence and relative abundance [are] governed by environmental conditions (which may determine available food supply), and by pollution tolerance levels of the respective species." Ibid. Since "[s]ampling is relatively easy, requires few people and inexpensive gear, and has minimal detrimental effect on the resident biota," benthic macroinvertebrate "assemblages [are] good indicators of localized conditions." Ibid.

The DEP's proposal provided a detailed explanation of its methodology for sampling benthic macroinvertebrates. 51 N.J.R. at 315-16. The samples are collected pursuant to "Standard Operating Procedures Ambient Biological Monitoring Using Benthic Macroinvertebrates Field, Lab, and Assessment Methods" issued by the Bureau of Freshwater and Biological Monitoring, and "based on guidance as outlined in [the EPA's] Rapid Bioassessment Protocols (RBP) for Use in Wadeable Streams and Rivers." 51 N.J.R. at 315.

The samples are scored pursuant to a region-specific, multi-metric index using guidelines outlined in the RBP. Ibid. The proposal explained the seven components of the muti-metric index in narrative form and in Tables B and C. Ibid. To support a C1 upgrade, "the result must indicate a nonimpaired benthic macroinvertebrate community (full use attainment), which is assessed and scored as either excellent or good." 51 N.J.R. at 316. Table E showed the DEP

23

scored the benthic macroinvertebrate community as "good" for this segment at three biomonitoring stations identified as AN0329, SB07, and SB08. 51 N.J.R. at 331.

The persons collecting the samples are either part of the DEP's Water Monitoring and Standards Program or other groups, including the RHA, which "follow[] the Department's protocol." 51 N.J.R. at 316. The DEP collects samples every five years from each region on a rotating schedule but considers data collected by other groups under certain conditions.

> [T]he Department will consider data generated by other groups provided that information has been or will be submitted pursuant to the data solicitation notice for the development of the Integrated Water Quality Assessment Report (Integrated Report) and meets the data collection requirements applicable to such submission. The data . . . must be collected in accordance with a Quality Assurance Project Plan (QAPP), which is approved by the [DEP], [EPA], or [USGS] (https://www.state.nj.us/dep/wms/bears/cwm vm.htm).
>
> [Ibid.]

"RHA conducts monitoring in the Raritan River watershed" and submits data used by the DEP in connection with the Integrated Report. Ibid. RHA's team of citizen volunteers "work[s] in partnership with professional scientists and government decision-makers" used by "collect benthic macroinvertebrate

24

samples . . . at more than [fifty] sites on streams and rivers in Hunterdon, Morris, and Somerset counties." Ibid. The proposal states that between 2012 and 2017, "[t]he RHA stream monitoring program collected high quality data to support the assessment of surface water quality and the overall health of the Raritan River watershed" that the DEP considered "to support the Category One designation process." Ibid. An important aspect of C1 designation is whether it provides an optimal stream habitat, a term of art encompassing not only water quality but also the characteristics of the stream and the adjacent riparian zone.

Optimal Instream Habitat

An optimal instream habitat "is identified by a variety of habitats within the stream, stable banks with little siltation or channelization, a variety of velocities and stream depths, a riparian zone covered by native vegetation where plants grow naturally, and an unimpacted riparian zone." Ibid.

Determining whether a segment provides an optimal instream habitat requires a qualitative habitat assessment of the benthic macroinvertebrate community "to determine whether it is healthy enough to continue to sustain the . . . community." Ibid. "The assessment encompasses an area of 100 to 200 feet around each benthic macroinvertebrate sampling site" and utilizes a matrix "to assess habitat quality . . . based on key physical characteristics of the waterbody

25

and surrounding land, particularly the subwatershed of the site under investigation." Ibid.

"[B]ased on a version of the [EPA] RBP calibrated for New Jersey streams," the assessment "results in each [monitoring] station being assigned one of four condition categories; optimal, sub-optimal, marginal, or poor (see https://www.state.nj.us/dep/wms/bfbm/rbpinfo.html))." Ibid. Table E showed that the DEP assigned a habitat rating of "optimal" at two of three biomonitoring stations in segments SB07 and SB08. 51 N.J.R. at 331. Monitoring station AN0329 received a "suboptimal" habitat rating. Ibid.

The DEP and RHA conduct qualitative habitat assessments utilizing the same methodology and procedures used to collect the benthic macroinvertebrate samples. 51 N.J.R. at 316. The DEP considered data collected by RHA between 2012 and 2017 in assessing the instream habitat for this segment, which "followed the [EPA] RBP for sampling and scoring the data collected, identical to [DEP's] protocol," in connection with the C1 designation process. Ibid.

Low Impervious Surface Area

The DEP's low impervious surface determination for the segment is not contested on appeal. "Impervious surfaces are identified largely, but not exclusively, as roadways and parking lots." 51 N.J.R. at 317. They "impede the

infiltration of rainfall into the soil and by doing so increase the amount of stormwater runoff from the land."  Ibid.  "[T]he greater the amount of impervious surface in the subwatershed, the more likely the aquatic community is adversely affected." Ibid.

> [F]or the level of impervious surface to be considered a factor supporting a waterbody being determined to be of exceptional ecological significance, the percentage of impervious surface must be less than two percent for subwatersheds (HUC 14) located in headwaters with drainage less than or equal to five square miles.  For subwatersheds (HUC 14) with drainage greater than five square miles, the percentage of impervious surface must be  [ten] percent or less . . . .
>
> [51 N.J.R. at 318.]

The DEP measured impervious surface at 4.7 percent for the segment, which satisfied the regulatory requirement.  51 N.J.R. at 331.

RTMUA's Objection to the Three Bridges Segment C1 Upgrade

RTMUA retained Kleinfelder, Inc., an engineering and science consulting firm specializing in water quality studies and assessments, to assess the DEP's supporting data for the Three Bridges Segment's C1 upgrade and to perform its own scientific study of the segment.  Relying on Kleinfelder's written comments and habitat assessment report that was submitted to the DEP during the public

comment period, RTMUA's substantive objection centered around its claim that the segment did not satisfy the regulatory criteria for a C1 upgrade.

As noted, the DEP scored the benthic macroinvertebrate community as "good" at three biomonitoring stations in the segment. Ibid. Initially, Kleinfelder contended that one of the three biomonitoring stations, SB08, was located downstream of the segment's endpoint and therefore irrelevant. It also contended that despite repeated OPRA requests, the DEP had not made available its analysis "which translates the raw data into a meaningful assessment score, using the seven-step metric process described in the C1 [p]roposal." It sought the "summary data sheets" on which the persons collecting the samples recorded their identifications of the macroinvertebrates, so that it could "confirm the assessment rating of 'good'" and "verify the accuracy of these results."

As for optimal habitat, the DEP assigned a habitat rating of "optimal" at monitoring stations SB07 and SB08. 51 N.J.R. at 331. Once again, Kleinfelder contended that SB08 was located downstream of the segment's endpoint and thus its "optimal" rating was irrelevant. It also asserted that because SB07 was rated "suboptimal" in 2012, 2013, 2014, and 2015 and only rated "optimal" in 2016 and 2017, "the segment should be considered suboptimal." Kleinfelder contended it could not "review and confirm the ratings assigned" to these

28

stations because the DEP had not provided the underlying data sheets used during the habitat assessment.

In addition, Kleinfelder contended that the DEP provided no evidence that "trained biologists" conducted the habitat assessments "as required" by the EPA and took issue with the DEP's reliance upon habitat assessment data collected by RHA's volunteers. It cited language from the EPA's RBP which states that "[m]any state water quality agencies employ trained and experienced benthic biologists" who can detect "[d]egraded conditions . . . with only a cursory examination" and biologists "well versed in the ecology and zoogeography of the region can generally recognize optimal habitat structure as it relates to the biological community."

Kleinfelder conducted a habitat assessment. It claimed it enlisted "a highly qualified staff biologist" experienced in water quality data monitoring and assessment to perform the assessment using the same EPA RBP protocol cited in the proposal. At each of the six locations assessed (five located within the segment), Kleinfelder's habitat assessment recorded a score of "suboptimal."

The Rule Amendment Adoption

The DEP filed its rule adoption incorporating "non-substantial changes not requiring additional public notice and comment[.]" 52 N.J.R. at 711. Upon

reviewing more recent data in response to public comments, the DEP reduced the area subject to a C1 upgrade from approximately 749 river miles to approximately 600 river miles. 52 N.J.R. at 711, 748.

The more recent data was "collected in accordance with a [QAPP] approved by the Department, the [EPA], or the [USGS]," and is "publicly available to ensure transparency and replicability." 52 N.J.R. at 711-12. The new data included:

> (1) AMNET [The Department's Ambient Macroinvertebrate Network], RHA, and FIBI data from 2017-2018, publicly available on the water quality portal (portal) at https://www.waterqualitydata.us/, which was developed in partnership with the [EPA], the USGS, and the United States Department of Agriculture (USDA);
>
> (2) water quality data for DO [dissolved oxygen], TP [total phosphorus], TSS [total suspended solids], and temperature from 2009-2019, publicly available through the portal at https://www.waterqualitydata.us/; and
>
> (3) the new impervious surface percentage data in the 2015 Land Use/Land Cover GIS layers, publicly available at https://gisdata-njdep.opendata.arcgis.com/.
>
> [52 N.J.R. at 712.]

Relevant to this appeal, the DEP revised the upstream boundary of the Three Bridges Segment "from the Main Street (County Route 613) bridge to the

first westerly tributary below the Main Street (County Route 613) bridge." 52 N.J.R. at 720. It explained that the new upstream boundary

> is a more appropriate boundary that represents both the healthy benthic macroinvertebrate communities, optimal habitat conditions (observed at the qualifying monitoring stations, SB07 and SB08), and the low percentage impervious surface of the subwatershed of HUC 14 02030105040010, Raritan R SB (Pleasant Run-Three Bridges) as identified in the GIS layer. Therefore, the Department is not adopting approximately 0.1 river miles of the South Branch Raritan River at Three Bridges.

> [52 N.J.R. at 720, 749.]

The DEP reported that due to the upstream boundary change, "Flemington Borough will no longer be impacted by the 300-foot riparian zone that is afforded to the tributaries of C1 waters and their upstream tributaries in the same HUC 14 watershed." 52 N.J.R. at 734. Similarly, certain upstream tributaries in the Township and County located in the same HUC 14 watershed will no longer be affected by the 300-foot riparian zones. Ibid.

In addition, the DEP claimed that "RTMUA will no longer be affected by the 300-foot riparian zone established around C1 waters and their tributaries" as its "outfall is located approximately 850 feet above the reclassified waters." 52 N.J.R. at 738. However, "antidegradation policies still apply to RTMUA with respect to any upgrade or expansion since there is a C1 stream downstream of

31

RTMUA" that must be protected from any measurable changes to the existing water quality.  Ibid.

These consolidated appeals followed.  In No. A-3545-19, RTMUA raises the following points for our consideration:

POINT I

DEP NEGLECTED TO FULLY CONSIDER ALL COMMENTS SUBMITTED IN RESPONSE TO THE RULE PROPOSAL IN VIOLATION OF THE MANDATES OF THE APA.

A. In Violation of APA, DEP Refused to Consider a Habitat Assessment Report and Associated Data and Photographs, Submitted on Behalf of Appellant During the Comment Period.

B. In Violation of APA, DEP Ignored Numerous Timely Comments Submitted by the County.

POINT II

THE DEPARTMENT'S FAILURE TO PROVIDE THE DATA AND DOCUMENTATION ON WHICH ITS DECISIONS WERE BASED, PREVENTED GOVERNMENTAL ENTITIES, INCLUDING APPELLANT, AND AFFECTED PROPERTY OWNERS FROM HAVING A REASONABLE OPPORTUNITY TO COMMENT.

POINT III

DEP'S RULE PROPOSAL OFFERED A MISLEADING, CONFUSING AND INTERNALLY INCONSISTENT DESCRIPTION OF THE WATERWAYS SUBJECT TO THE UPGRADE TO

32

CATEGORY ONE THEREBY FAILING TO PROVIDE NOTICE, IN VIOLATION OF THE APA, TO THE INDIVIDUALS AND BUSINESSES THAT WILL BE AFFECTED BY THE UPGRADES AND THE ASSOCIATED EXPANSION OF THE RIPARIAN ZONE.

A. The Department's Notice of Rulemaking Failed to Serve as Reasonable Notice Under the APA to All Those Who Were Potentially Affected by the Rule Because the Mapping Published with It Was Insufficient, Incomplete and Misleading. The Mapping Did Not Alert the Public of the Potential for New Regulation that Might Have an Adverse Impact.

B. The Proposal was Internally Inconsistent, making it Confusing and Difficult to Understand.

C. DEP's Rule Proposal Failed to Serve as Proper Notice Under the APA Because It Did Not Identify Properties that Would Be Subject to the Extensive 300-Foot Riparian Buffer Zone Under the Flood Hazard Act.

D. DEP Arbitrarily[,] Capriciously and Unreasonably Failed to Develop the Proposal Prior to Publishing it, Leading Directly to the Incomplete and Inadequate Notice and the Confusion and Inconsistencies in the Proposal.

POINT IV

DEP HAS FAILED TO PRESENT CREDIBLE DATA TO SUPPORT THE DESIGNATION OF THE LISTED SEGMENT AS CATEGORY ONE AND, IN FACT, RECENTLY DESIGNATED THE SUB-WATERSHED (THE "HUC") IN WHICH THE

33

LISTED SEGMENT IS LOCATED AS IMPAIRED, WHICH IS CONSISTENT WITH APPELLANT'S FINDING THAT THE LISTED SEGMENT DOES NOT SUPPORT THE HABITAT NECESSARY TO DESIGNATE IT AT CATEGORY ONE.

A. The Habitat Assessment Data Relied Upon by DEP In Designating the Listed Segment as Category One Was Inadequate and Improperly Collected by Unqualified Volunteers.

1. The Monitoring Station(s) Used by Volunteers for Collecting Data, and the Resulting Data Itself, Was Inadequate to Support Designation of the Listed Segment as Category One.

2. Scientifically Untrained Volunteers Were Charged with Collecting Critical Data Rendering the Rulemaking for the "Listed Segment" "Ultra Vires."

B. In Contradiction to its Upgrade of the Listed Segment to C1, in October of this Year, DEP Identified the Entire Sub-Watershed in which the Listed Segment is Located as "Impaired" in a Report Prepared Pursuant to the Federal Clean Water Act.

C. The Rule as Adopted is a Misuse of the Category One Designation.

1. The C1 Status is Reserved for High Quality Waters.

2. Kleinfelder Skilled Environmental Biologist Determined the Listed Segment to be Sub-Optimal.

POINT V

IMPACT ANALYSES FOR HOUSING AFFORDABILITY, JOBS, AGRICULTURE, ENVIRONMENT, SOCIAL, ECONOMIC, FEDERAL STANDARDS, REGULATORY FLEXIBILITY AND SMART GROWTH DEVELOPMENT WERE INADEQUATE AND VIOLATE THE PRINCIPLES OF ENVIRONMENTAL JUSTICE.

A. DEP Did Not Provide a Real Measure of the Impacts on Other Public Policies and Interest.

B. This Rule Proposal Contravenes the State's Policies Seeking Environmental Justice.

In No. A-3554-19, the Township and County argue:

POINT I

STANDARD OF REVIEW OF ADMINISTRATIVE AGENCY ACTION.

POINT II

DEP'S ADOPTION OF AMENDMENTS TO THE SWQS WAS NOT IN "SUBSTANTIAL COMPLIANCE" WITH THE APA AND THEREFORE MUST BE INVALIDATED.

A. DEP Failed to Substantially Comply with the APA Because the Notice Did Not Provide a Clear and Concise Statement of the Effect of the Proposed Rule, Particularly on Those Most Directly Affected.

B. DEP Failed to Provide Proper Notice Under and Substantially Comply with the APA Because

the Impact Statements in the Proposal Did Not Sufficiently Address the Impacts of the C1 Amendments.

    1. Socio-Economic Impact.

        a. Social Impact Statement.

        b. Economic Impact Statement.

    2. Jobs Impact Statement.

    3. Agriculture Industry Impact Statement.

    4. Regulatory Flexibility Analysis.

    5. Housing Affordability Impact Analysis.

    6. Smart Growth Development Impact Analysis.

C. DEP Failed to "Fully Consider" and Properly Respond to Public Comments that Raised Significant Concerns Regarding the Consequences and Impacts of the C1 Amendments.

POINT III

DEP'S ADOPTION OF THE C1 AMENDMENTS WAS ARBITRARY, CAPRICIOUS AND UNREASONABLE.

POINT IV

DEP VIOLATED THE DUE PROCESS RIGHTS OF OWNERS OF PROPERTY IMPACTED BY THE AMENDMENTS.

An agency's regulations are presumed valid and reasonable. N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008). Accordingly, "[t]he party challenging their validity bears the burden of proving that the regulations are arbitrary, capricious or unreasonable." N.J. State League of Muns. v. N.J. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999). Where the agency's action calls for the application of its inherent expertise, "an even stronger presumption of reasonableness exists." IFA Ins. Co. v. N.J. Dep't of Ins., 195 N.J. Super. 200, 208 (App. Div. 1984). This deference is particularly appropriate "when the agency has been delegated discretion to determine the specialized and technical procedures for its tasks." In re Adoption of N.J.A.C. 7:26E-1.13, 377 N.J. Super. 78, 99 (App. Div. 2005) (quoting In re Adopted Amends. to N.J.S.A. 7:7A-2.4, 365 N.J. Super. 255, 264 (App. Div. 2003), aff'd, 186 N.J. 81 (2006)).

Generally, a reviewing court will not reverse an agency's promulgation of regulations unless:

> (1) the regulations at issue "violate[] the enabling act's express or implied legislative policies;" or (2) "there is [not] substantial evidence in the record to support the findings on which the agency based its action;" or (3) "in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors."

> [N.J. Soc'y for Prevention of Cruelty, 196 N.J. at 385
> (alterations in original) (quoting In re N.J.A.C. 10:82-
> 1.2 & 10:85-4.1, 117 N.J. 311, 325 (1989)).]

The court's deference to administrative agencies "stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" N.J. State League of Muns., 158 N.J. at 222 (alteration in original) (quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Hum. Servs., 96 N.J. 456, 474 (1984)); accord In re Stormwater Mgmt. Rules, 384 N.J. Super. 451, 465 (App. Div. 2006). But that deference "does not require abdication by the judiciary of its function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." N.J. Soc'y for Prevention of Cruelty, 196 N.J. at 386 (quoting Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989)).

Compliance with APA Rulemaking Requirements

RTMUA, the Township, and the County contend that the DEP did not comply with the APA in adopting the amendments. The Business amici curiae, Flemington, and New Jersey Farm Bureau advance similar arguments. The

Township and County further contend that, in failing to comply with the APA, the DEP violated the due process rights of property owners impacted by the amendments.

The APA governs agency rulemaking, which has been described as "a legislative-like activity." In re Provision of Basic Generation Serv., 205 N.J. 339, 348-49 (2011) (citing N.J.S.A. 52:14B-2). The APA defines "administrative rule" or "rule" as "each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2. "The term includes the amendment . . . of any rule[.]" Ibid.

Rulemaking "is 'designed to take advantage of the agencies' resources and expertise' which make them uniquely suited for understanding and solving specialized problems." In re Provision of Basic Generation Serv., 205 N.J. at 349 (quoting Bergen Pines, 96 N.J. at 474).

"If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." Airwork Serv. Div., Div. of Pac. Airmotive Corp. v. Dir., Div. of Tax'n, 97 N.J. 290, 300 (1984). The APA procedures for rulemaking

require[] that the agency give the public at least thirty days notice of the proposed change; publicly distribute a summary of the proposed rule, its purpose, the authority under which its adoption is authorized, and various analyses of the proposed rule; give interested parties at least thirty days to submit written and oral comments; review the public comments; under certain circumstances, conduct a public hearing on the proposed rule, providing fifteen days' notice prior to the hearing; and prepare a summary of comments received and who submitted them for public distribution.

[N.J. Animal Rts. All. v. N.J. Dep't of Env't Prot., 396 N.J. Super. 358, 370 (App. Div. 2007) (citing N.J.S.A. 52:14B-4).]

"The purpose of the APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated.'" In re Provision of Basic Generation Serv., 205 N.J. at 349 (quoting In re 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J. Super. 2, 43 (App. Div. 2004)).

Rulemaking is only valid when conducted "in substantial compliance with" the APA. N.J.S.A. 52:14B-4(d). "The filing of a certified copy of any rule shall be deemed to establish the rebuttable presumption[] that . . . all requirements of [the APA] and of interagency rules of the director relative to such rule have been complied with . . . ." N.J.S.A. 52:14B-5(d); see N.J.A.C.

40

1:30-1.12(a) (explaining that the Office of Administrative Law (OAL) reviews "any proposed or adopted rule . . . or any notice" for "compliance with the technical or procedural requirements concerning rulemaking" and "shall assist the agency in a cooperative effort to obtain compliance").

Although the term "substantial compliance" is not defined in the APA or the regulations, case law illustrates that a lack of proper notice or an inability to comment on a proposed agency rule will result in a finding that the agency failed the substantial compliance test.  See, e.g., In re Adoption of Rules Concerning Conduct of Judges of Comp., N.J.A.C. 12:235-3.11 Through 3.23, 244 N.J. Super. 683, 687 (App. Div. 1990) (invalidating agency rule due to lack of individual mailed notice to fifty state employees directly affected "whose identities and addresses" were "well known" to the agency); Glaser v. Downes, 126 N.J. Super. 10, 17-19 (App. Div. 1973) (invalidating agency rule due to a total lack of notice and inability to comment on the proposal).

Notice to Stakeholders of Proposed Rulemaking

The agency is required to "prepare a 'notice of proposal,'" N.J.A.C. 1:30-5.1(a), which must include, "a statement setting forth a summary of the proposed rule, as well as a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized," and the

impact statements. N.J.S.A. 52:14B-4(a)(2). To that end, the statement must describe and identify:

> i. Who and what will be affected by the proposal;
>
> ii. How, when and where the effect will occur;
>
> iii. What the rulemaking prescribes, proscribes, or otherwise mandates;
>
> iv. What enforcement mechanisms and sanctions may be involved; and
>
> v. Any other relevant or pertinent information[.]
>
> [N.J.A.C. 1:30-5.1(c)(1).]

The APA requires notice of proposed rulemaking. N.J.S.A. 52:14B-4(a). "Prior to the adoption, amendment, or repeal of any rule, . . . the agency shall : (1) [g]ive at least [thirty] days' notice of its intended action" published in the New Jersey Register and "additionally publicize[d]" in other ways to be determined by the agency, which "shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the time when, the place where, and the manner in which interested persons may present their views thereon." Ibid. In turn, N.J.A.C. 1:30-5.2 sets forth the following publication and distribution of notice requirements:

(a) After the OAL's receipt of a notice of proposal that conforms to the requirements of N.J.A.C. 1:30-5.1:

1. The OAL shall submit the notice, within two business days of receipt, to the Senate and the General Assembly;

2. The OAL shall publish the notice of proposal in the next available issue of the New Jersey Register.  Pursuant to N.J.S.A. 52:14B-7(c), any notice of proposal that would be cumbersome, or unduly expensive to publish, shall not be printed in full.  Instead, such notices shall be summarized in the Register.  The proposing agency shall make available the notice of proposal and provide in the published notice the manner in which, and from where, copies may be obtained;

3. The agency shall mail or e-mail either the notice of proposal, as filed, or a statement of the substance of the proposed action to:

i. Interested persons;

ii. Those persons who have made timely request of the agency for notice of its rulemaking actions; and

iii. Those persons on the agency's electronic mailing list or similar type of subscription-based e-mail service;

4. The agency shall distribute either the notice of proposal, as filed, or a statement of the substance of the proposed action to the news media maintaining a press office in the State House Complex;

5. The agency shall publish the notice of proposal on its Internet website, no later than the date of publication of the notice in the New Jersey Register; and

6. The agency shall undertake an additional method of publicity, other than dissemination under (a)2, 3, 4, and 5 above. Each agency shall adopt rules prescribing the manner in which it shall provide additional publicity under this paragraph, which rules shall set forth the circumstances under which each additional method shall be employed.

i. The additional method of publicity shall include information on the time, place, and manner in which interested persons may present comments and either of the following:

(1) The full text of the proposed rule;

(2) A statement of the substance of the proposed action; or

(3) A description of the subject and issues involved.

ii. The additional method of publicity may be by:

(1) Notice in a newspaper of general circulation;

(2) Trade, industry, government, or professional publications;

(3) Distribution of a press release to the news media; or

(4) Posting of a notice in an appropriate location(s), including the agency's Internet website.

(A) If an agency's rule on its method of additional publicity promulgated pursuant to this paragraph provides that the agency's method shall be posting of notice on its Internet website, the publication of a notice of proposal from the agency on the agency's Internet website pursuant to (a)5 above shall satisfy the additional publicity requirements of this paragraph for that notice of proposal.

(b) Additional notice of the rulemaking under (a)3, 4, and 6 above shall be provided at least [thirty] days prior to the close of the public comment period.

The APA's notice requirement is "not to be lightly applied or regarded as [an] obstacle[] to be avoided. [It is] designed to serve the cause of fairness by providing a mechanism for informing the affected public adequately of the operation and impact of proposed administrative rules and regulations . . . ." Fed. Pac. Elec. Co. v. N.J. Dep't of Env't Prot., 334 N.J. Super. 323, 343 (App. Div. 2000). "The goal should be to afford effective notice, to the end that public

comment be encouraged and given a meaningful role in the process of rule adoption." In re N.J.A.C. 12:235-3.11 Through 3.23, 244 N.J. Super. at 687.

The Alleged Mapping Deficiencies

A central issue in this appeal is the adequacy of the mapping of the involved waterways provided by the DEP. RTMUA, the Township, and the County challenge the adequacy of the mapping. They primarily contend the DEP failed to give proper notice to affected individuals and businesses, arguing that the mapping of the affected waterways, especially the upstream tributaries, was "insufficient, incomplete and misleading" and failed to "describe, detail and identify" who and what would be affected by the proposal. While they acknowledge the DEP issued additional maps in May 2019 that showed the upstream tributaries, they claim that because that occurred ten weeks into the extended comment period and was posted "on an obscure DEP stakeholder website," it did not cure the initial notice defect.

In addition, they point to discrepancies between the maps the DEP initially provided in March 2019, and the May 2019 maps produced in response to RTMUA's OPRA requests. RTMUA claims the DEP "identified numerous streams within the South Branch Raritan River that would be impacted by the C1 upgrade" on the May 2019 map "that were not previously shown." RTMUA

also claims that "the actual GIS layer" conflicted with both the March 2019 and May 2019 maps as it contains a stream segment not shown on those maps.

The DEP asserts that its narrative descriptions of the affected waterways provided sufficient notice purposes and its issuance of several "informal" PDF maps as visual aids was "immaterial" as maps are not required by the regulation.

Appellants' contentions pertaining to mapping are appealing from a common-sense perspective. If the DEP offers maps as a visual aid, it is reasonable to expect the maps will be accurate and will not be in conflict. However, appellants have not cited any legal authority to support their position that maps are a required component of the notice required by the APA under the circumstances presented here.

The DEP also provided tables listing the waterbodies subject to C1 upgrade, the municipalities and counties affected, and the NJPDES facilities potentially affected. 51 N.J.R. at 326-32. Table E demonstrates that the stream segment at issue was located within the municipalities of Branchburg and Hillsborough in Somerset County, and the municipalities of Raritan and Reading in Hunterdon County. 51 N.J.R. at 331. It identified RTMUA as a potentially affected NJPDES facility. Ibid.

Considering the goal of the notice provision to encourage public comment, we find that the narrative descriptions, coupled with the maps and information set forth in Table E, provided effective notice and encouraged public comment in substantial compliance with APA requirements despite the minor mapping discrepancies. They "describe, detail, and identify" who or what will be affected, in compliance with N.J.A.C. 1:30-5.1(c)(1). They indicate to a layperson that if they own property within 300 feet of the segment, or any tributary of the segment, they will be affected by the C1 upgrade, and that customers of RTMUA will potentially be affected as well, regardless of where they live. Notably, the DEP received 1,753 comments in response to the proposal. 52 N.J.R. at 712. Moreover, as we discuss infra at pages 73-74 and footnote 11, the Township was able to identify the 1,970 properties located within the Township affected by the 300-foot riparian zone buffer.

Notice to Individual Property Owners

Appellants contend the DEP failed to provide notice to individual property owners subject to the 300-foot riparian zone in violation of the APA. They rely on a single case that is factually distinguishable from the present matter.

In In re N.J.A.C. 12:235-3.11 Through 3.23, the proposed rules advanced by the Department of Labor concerned "the conduct and discipline of Judges of

Compensation" and affected "about 50 state employees whose identities and addresses [were] well known." 244 N.J. Super. at 684, 687. The Department of Labor declined "to notify each affected person directly" but published notice in the New Jersey Register. Id. at 686.

While we recognized that "[t]he agency has discretion to decide what means of additional publication is most appropriate, which means most practical, suitable and effective," we held that "a proposed regulation directly, uniquely and significantly affecting about [fifty] state employees whose identities and addresses are well known, must be additionally publicized to inform them of the proposed regulation and the time and manner of comment." Id. at 687. We explained that "[w]hen dealing with [fifty] state employees who as a group receive regular mailings from their Division, individual mailing is obviously practical, suitable and effective." Ibid. Because the Department of Labor had not provided notice via individual mailing, we held that the regulation was not adopted in substantial compliance with the APA's notice requirement and was therefore invalid. Ibid.

Here, the proposal has statewide implications and may affect thousands of people or businesses that own property adjacent to the 600 river miles upgraded to C1 and subject to the 300-foot riparian zone. Individually contacting all

affected property owners by mail was impractical as the DEP likely did not know their identities or their contact information.  See Gillespie v. Dep't of Educ., 397 N.J. Super. 545, 556-57 (App. Div. 2008) (distinguishing In re N.J.A.C. 12:235-3.11 Through 3.23, and holding that the APA notice requirement was satisfied without individual mailed notice "to [the] thousands of school employees" potentially affected by the newly-proposed regulations).  Thus, the DEP was not required to individually notify all affected property owners by mail to substantially comply with the APA's notice requirement.

The Stakeholder Process

We next examine the opportunity for interested parties to participate. RTMUA and the Business amici curiae claim that the absence of a meaningful stakeholder process resulted in a lack of substantial compliance with the APA's notice requirement.  They argue that holding one stakeholder meeting just two weeks before the DEP submitted the proposal for publication was insufficient, but do not cite any provision in the APA in support of their position.  Instead, they rely upon Executive Order 63 (EO 63), which did not take effect until months after the DEP's rule proposal was published.  Exec. Order No. 63 (Apr. 2, 2019), 51 N.J.R. 521(b) (May 6, 2019).

Paragraph 3 of EO 63 states that before issuing a rule proposal, state agencies should "to the extent applicable and practicable . . . engage with affected communities, and provide opportunities for various groups to work in partnership with the State in crafting solutions" and that the options agencies "should consider may include, but are not limited to:  i. Gathering information through meetings and/or other discussions with affected communities in advance of formulating a proposed rule; and/or ii. Publishing and broadly disseminating a notice of pre-proposal, and seeking comments."  Ibid.

EO 63 did not take effect until June 1, 2019, almost three months after the March 4, 2019, publication of the rule proposal.  Ibid.  Moreover, Paragraph 9 of EO 63 states that "[n]othing in this Order . . . shall be used as a basis for legal challenges to rules, approvals, permits, licenses or other actions or inaction by a State entity."  Ibid.  Thus, reliance on EO 63 is misplaced.

In any event, consistent with the intent of EO 63, the DEP held a stakeholder meeting on January 17, 2019, before issuing the proposal.  51 N.J.R. at 309.  The DEP extended the comment period at the request of multiple stakeholders to allow them to meaningfully participate in the rulemaking process, in furtherance of the APA's notice requirement, and ultimately adopted an amended version of the regulations it had proposed in consideration of the

comments from stakeholders.  For these reasons, we find the DEP's stakeholder process substantially complied with the APA's notice requirement.

Disclosure of Raw Data and Technical Information

RTMUA and the Business amici contend that the DEP's failure to disclose the raw data and "technical information" that supports its C1 upgrades – specifically, the raw data pertaining to the DEP's assessment of nonimpaired benthic macroinvertebrate communities and optimal instream habitats – violates the APA's notice requirement.

RTMUA and the Business amici fail to cite any language in the APA or other legal authority that requires the DEP to disclose the raw data to substantially comply with the notice requirement.  Furthermore, the DEP maintains its proposal "included website links for the public to obtain the underlying data and reports."

The proposal's detailed summary statement explained the C1 designation's meaning, the stream segments that were affected, the scientific basis for the C1 upgrades, and their significance.  51 N.J.R. at 309-42.  The DEP clearly summarized its methodology and the scientific data it relied upon in support of its decision to upgrade the listed segments to C1 status, in compliance with the APA's notice requirement.  51 N.J.R. at 314-18, 324-25.

As explained in the proposal, the raw data collected in connection with the assessment of the benthic macroinvertebrate community was translated into a meaningful assessment score through a complex metric based upon EPA standards. 51 N.J.R. at 315-16. The raw data was scored pursuant to DEP protocol, which was developed in accordance with EPA protocol. 51 N.J.R. at 316. The proposal provided website links to documents detailing the DEP's standard procedures and protocols and listed the scores and ratings for each affected stream segment. 51 N.J.R. at 315-16, 326-32.

Furthermore, the raw data RTMUA and Business amici are claiming was inaccessible through the links the DEP provided did not ultimately serve as a basis for the C1 upgrades. After consideration of the comments, including those from RTMUA, which stated that the DEP's data was outdated, the DEP "reevaluated the proposed C1 upgrades using the most recent publicly available data" for "the AMNET, FIBI, habitat, water quality, and percent impervious surface" and provided updated website links to that data. 52 N.J.R. at 726, 728.

Even assuming the old raw data was either inaccessible or difficult to access via the DEP's website links, RTMUA and the Business amici have not demonstrated that they or the other stakeholders were substantially prejudiced as a result. See Safeway Trails, Inc. v. Bd. of Pub. Util. Commr's, 42 N.J. 525,

539 (1964) (discussing the excusal of an agency's "failure to put in evidence the specific materials on which it relies in promulgating its rules, where a reasonable basis for the adoption of the regulations appears in the record and it otherwise indicates that the interested parties were in fact aware of the underlying reasons or were not prejudiced."); Am. Cyanamid Co. v. State, Dep't of Env't Prot., 231 N.J. Super. 292, 309 (App. Div. 1989) ("Although the DEP would have been better advised to have included all supporting data in the record, we are satisfied that this oversight did not cause substantial prejudice.").

On this record, we conclude that the DEP provided sufficient notice of the proposed amendments, including the reasons for the C1 upgrades, and substantially complied with the APA's notice requirements.

Sufficiency of the Impact Statements

"The essential purpose" of impact statements "is to provide interested parties with notice of the impacts anticipated by the agency proposing the rule." In re N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462, 506-07 (App. Div. 2010), aff'd as modified, 215 N.J. 578 (2013). "Such notice affords interested parties the opportunity to participate meaningfully in the rule-making process and to 'inform[] regulators of possibly unanticipated dimensions of a contemplated

54

rule.'" Id. at 507 (alteration in original) (quoting In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 365 (App. Div. 2002)).

The APA requires the agency to provide the following impact statements in its proposal: (1) a socio-economic impact statement; (2) a regulatory flexibility analysis; (3) a jobs impact statement; (4) an agriculture industry impact statement; (5) a housing affordability impact statement; (6) a smart growth development impact statement; and (7) a racial and ethnic community criminal justice and public safety impact statement. N.J.S.A. 52:14B-4(a)(2). N.J.A.C. 1:30-5.1(c) details what each impact statement must address.

Although the DEP included all requisite impact statements in the proposal in substantial compliance with the APA, 51 N.J.R. at 338-42, the parties and amici express a litany of reasons why their content fell short. We are unpersuaded.

### The Social Impact Statement

The social impact statement shall "describe[] the expected social impact of the proposed rulemaking on the public, particularly on any segments of the public proposed to be regulated, and includ[e] any proposed or expected differential impact on different segments of the public, including the rulemaking action, and justification therefor." N.J.A.C. 1:30-5.1(c)(2). See In re Protest of

Coastal Permit Program Rules, 354 N.J. Super. at 365 (holding that the DEP's socio-economic impact statement "was sufficient . . . because it set forth the impact that DEP 'anticipated' or expected from the proposed regulations" and because the APA "does not require a more convincing socio-economic impact analysis").

The Township and County claim that the DEP's four-sentence social impact statement is "superficial and self-serving," copied from its social impact statement in a 2007 proposal to amend the SWQS, and does not comply with APA requirements. The record nevertheless reflects that the social impact statement substantially complied with the APA. Although brief, it expresses the DEP's view that it expected the proposed amendments to have a positive social impact for all state residents because they will improve the State's water quality, thereby benefiting public health, recreational opportunities, and businesses alike. 51 N.J.R. at 338. The Township and County have not shown that assessment is inaccurate.

The Economic Impact Statement

The economic impact statement shall "describe[] the expected costs, revenues, and other economic impact upon governmental bodies of the State, and particularly any segments of the public proposed to be regulated." N.J.A.C.

1:30-5.1(c)(3).  "All that is required is for the agency to describe the <u>expected</u> economic impact."  <u>In re Rules Regarding Prop. Disposition of Casino Licensee (N.J.A.C. 19:41-7.2(A))</u>, 224 N.J. Super. 316, 324 (App. Div. 1988); <u>accord</u> <u>In re Protest of Coastal Permit Program Rules</u>, 354 N.J. Super. at 365.

The Township and County contend that the economic impact statement is insufficient because the DEP failed to provide a cost-benefit analysis of the amendments, "evaluat[ing] what value was added by designating the waterways as C1 . . . in comparison to the costs of the Proposal."  Flemington asserts that the DEP should have identified municipality-specific economic impacts.  The Business amici contend that the DEP "ignore[d] the upstream application of the C1 [a]mendments" and the effect of the 300-foot riparian zones on development, redevelopment, property values, and real estate taxes.

The DEP's comprehensive economic impact statement substantially complied with the APA.  It thoroughly described the expected economic impact of the proposed amendments, including the potential negative impacts on development in the 300-foot riparian zones, the exclusions from sewer service, and the expansion restrictions on new and existing wastewater treatment plants. 51 N.J.R. at 338-39.  The statement outlined the expected costs associated with obtaining requisite permits and mitigation planning under FHACA rules that

developers and property owners will likely incur. 51 N.J.R. at 339. It also discussed the expected capital and annual costs that new and existing wastewater treatment plans will likely incur to comply with the "no measurable change" requirement. 51 N.J.R. at 338-39.

The APA does not require a municipality-specific economic impact assessment addressing the effect of the proposed amendments on individual property values or property taxes. Nonetheless, in its response to comments, the DEP stated that it "does not anticipate that the C1 upgrades will significantly impact property values or tax assessments." 52 N.J.R. at 736. Moreover, the APA does not require a formal cost-benefit analysis. The DEP nevertheless cited counterbalancing positive economic impacts and explained that restricting development in environmentally sensitive areas reduces environmental degradation, thereby improving water quality, biodiversity, and flood control. 51 N.J.R. at 338.

The Jobs Impact Statement

The jobs impact statement "shall include an assessment of the number of jobs to be generated or lost if the proposed rule takes effect[.]" N.J.S.A. 52:14B-4(a)(2); N.J.A.C. 1:30-5.1(c)(5). The Township and County contend that the jobs impact statement is deficient because it does not quantify the number of

58

jobs to be generated or lost. RTMUA and Flemington contend that the jobs impact statement focuses on job creation without providing supporting data, and without considering the potential for job losses in Flemington and other communities.

The record shows the jobs impact statement substantially complied with APA requirements. The DEP did not quantify the expected number of jobs to be generated or lost, but stated that the proposed amendments would have a "limited impact on jobs" overall. 51 N.J.R. at 340. It acknowledged potential job loss if wastewater facilities opt to relocate out-of-state due to the restrictions imposed upon them, and the potential for job creation in the areas of permitting compliance, environmental consulting, and water-related industries. Ibid.

Neither the APA nor the related regulations require inclusion of supporting data in a jobs impact statement, nor do they require a municipality-specific assessment. Disagreement with the DEP's jobs impact assessment is an insufficient reason to invalidate the rulemaking. See Animal Prot. League of N.J. v. N.J. Dep't of Env't Prot., 423 N.J. Super. 549, 574 (App. Div. 2011) ("Disagreement with a reasoned, supported agency determination does not give rise to an APA violation.").

The Agriculture Industry Impact Statement

The agriculture industry impact statement shall "set[] forth the nature and extent of the impact of the proposed rule on the agriculture industry[.]" N.J.A.C. 1:30-5.1(c)(6). The Township and County assert that the agriculture industry impact statement "is undetailed and vague," "failed to provide any specific cost information," and failed to consider the impact of the 300-foot riparian zone on farming activities. The New Jersey Farm Bureau echoes those assertions, criticizes the conclusory nature of the agriculture impact statement, and contends the DEP should have provided, among other things, mapping of the individual "agricultural properties" affected.[7]

We find that the agriculture impact statement substantially complied with APA requirements. The DEP determined that the proposed amendments would result in "minimal impact" to the agriculture industry because most agricultural operations do not discharge to surface waters but instead discharge to

---

[7] The New Jersey Farm Bureau also contends that the amendments' extension of the riparian zone along the C1 designated waters is "ultra vires as applied to generally accepted agricultural operations or practices." Because this argument has not been asserted by a party and is "raised for the first time by an amicus curiae," we decline to address it. State v. J.R., 227 N.J. 393, 421 (2017); accord State in Int. of A.A., 240 N.J. 341, 359 n.1 (2020).

A-3545-19

groundwater, and no "concentrated animal feeding operation[s]" were located near a waterbody subject to C1 upgrade. 51 N.J.R. at 340.

On balance, the DEP acknowledged that if a farm discharges into a C1 waterbody, then the farm would incur permitting-related costs and fees based upon the nature of the operation, among other site-specific variables. Ibid. Neither the APA nor the regulations require the DEP to provide specific cost information, which would vary from farm to farm, or mapping of individual agricultural properties affected. We conclude that the agriculture industry impact statement substantially complied with applicable requirements.

The Regulatory Flexibility Analysis

"Rules that impose reporting, recordkeeping, or other compliance requirements on small businesses" must address the following factors "with as much quantification as is practical or reliable, the following":

> (1) A description of the types and an estimate of the number of small businesses to which the rule will apply;
>
> (2) A description of the reporting, recordkeeping, and other compliance requirements, and the kinds of professional services likely to be needed to comply with the requirements;
>
> (3) An estimate of the initial capital costs, and an estimate of the annual compliance costs, with an

indication of any likely variation on small businesses of differing types and sizes; and

(4) An indication of how the rule is designed to minimize any adverse economic impact on small businesses.

[N.J.A.C. 1:30-5.1(c)(7)(iv).]

The Township and County contend that the DEP did not "provide specific estimates as to the number of small businesses that would be impacted," quantify "specific cost information," or indicate "how the rule is designed to minimize adverse economic impact on small businesses."

The record reflects that the DEP indicated that two NJPDES facilities potentially qualify as small businesses. 51 N.J.R. at 340-41. It addressed and identified the types of initial capital costs, annual compliance costs, and professional services needed for compliance, explaining that they would vary depending upon numerous site-specific factors. Ibid. The regulation does not require the DEP to quantify the related costs.

In addition, the DEP explained that "[t]he proposed amendments apply equally to all businesses, including small businesses," that it "balanced the expected economic impacts of the rules upon small businesses against the need to protect the environment and public health while complying with Federal law," and that "any further attempt to relax the requirements for small businesses

could potentially endanger public health and the environment." 51 N.J.R. at 341. We conclude that the DEP's regulatory flexibility analysis substantially complied with APA requirements.

The Housing Affordability Impact Statement

The housing affordability impact statement must include "a description of the types and an estimate of the number of housing units to which the rulemaking will apply, and a description of the estimated increase or decrease in the average cost of housing that will be affected by the rulemaking" unless "the proposing agency finds that the rulemaking would impose an insignificant impact on the affordability of housing and there is an extreme unlikelihood that the rulemaking would evoke a change in the average costs associated with housing." N.J.A.C. 1:30-5.1(c)(8)(i). "The agency's findings and an indication of the basis for its finding shall be included in the analysis." Ibid.

RTMUA asserts that the DEP failed to analyze "the impact on affordable housing obligations," did not offer a "factual assessment of the impact on housing, land development or property taxes," and contravened the State's environmental justice policies.[8] The Township and County contend that the

---

[8] "'Environmental Justice' includes, at a minimum, ensuring that residents of all communities receive fair and equitable treatment in decision-making that affects

DEP's assessment lacks an "analysis or justification for its conclusion" and ignores the effect of the 300-foot riparian zones and the lack of availability of sewer service in these areas. Flemington and the Business amici advance similar contentions.

The DEP determined that the proposed amendments would not impact housing affordability "because it is extremely unlikely that the amendments will evoke a major change in the average costs associated with housing." 51 N.J.R. at 341. It therefore concluded it was not required to estimate the number of housing units that the rulemaking would impact. The DEP did not provide a clear basis for its conclusion in that regard. It stated only that the riparian zones would be advantageous to current property owners because "further growth may be restricted" in those zones. Ibid.

While the DEP could have included a fuller explanation of the basis for its conclusion, the housing affordability impact statement nonetheless "provided adequate notice to municipalities and other interested parties" and gave them

their environment, communities, homes, and health." Exec. Order No. 23 (Apr. 20, 2018), 50 N.J.R. 1241(b) (May 21, 2018). New Jersey's Environmental Justice Law, N.J.S.A. 13:1D-157 to -161, which requires the DEP to evaluate the environmental and public health impacts of certain facilities on overburdened communities when reviewing permit applications, does not take effect until the DEP adopts the implementing regulations, and that has not yet occurred. N.J.S.A. 13:1D-161(a).

"an adequate opportunity to submit comments on the issue" in keeping with the goal of impact statements. In re N.J.A.C. 5:96 & 5:97, 416 N.J. Super. at 507. The APA's substantial compliance requirement does not demand perfect compliance. Interested parties were put on notice of the DEP's conclusion, had the opportunity to publicly comment, and did so.

RTMUA's claim that the impact statement contravenes the State's environmental justice policies is unfounded. Its speculative argument presumes that the proposed amendments adversely impact the availability of affordable housing in areas adjacent to C1 waters, thereby preventing state residents from moving out of overburdened communities. In its response to RTMUA's comments on this issue, the DEP maintained that "planning affordable housing developments in flood-prone riparian areas" would be contrary to environmental justice policies. 52 N.J.R. at 746. RTMUA has not shown that any planned or contemplated affordable housing will be affected.

The Smart Growth Development Impact Statement

The smart growth development impact statement must include "a description of the types and an estimate of the number of housing units to which the rulemaking will apply, a description of the estimated increase or decrease in the availability of affordable housing that will be affected by the rulemaking"

and "a description as to whether the rulemaking will affect, in any manner, new construction within Planning Areas 1 or 2, or within designated centers, under the State Development and Redevelopment Plan."  N.J.A.C. 1:30-5.1(c)(9). However, this analysis need not be included where "the proposing agency finds that the rulemaking would impose an insignificant impact on smart growth and there is an extreme unlikelihood that the rule would evoke a change in the housing production within Planning Areas 1 or 2, or within designated centers, under the State Development and Redevelopment Plan."  N.J.A.C. 1:30-5.1(c)(9)(i).  "The agency's finding and an indication of the basis for its finding shall be included in the analysis."  Ibid.

The Township and County contend that because the DEP did not find that the proposed amendments "would impose an insignificant impact on smart growth" or "an extreme unlikelihood that the rule would evoke a change in the housing production within Planning Areas 1 or 2, or within designated centers," it was not exempt from the requirements of N.J.A.C. 1:30-5.1(c)(9), and failed to address those requirements in its smart growth impact statement.  They also contend that the DEP did not provide any analysis or basis for its findings. Flemington and the Business amici advance similar arguments.

Echoing the determination in its housing affordability impact analysis, the DEP determined that while "the proposed amendments may restrict the use of land within the expanded riparian zone" in eleven designated centers, the amendments "are not anticipated to have an overall impact on housing" and that any impacts on development "will not be large enough to evoke a change in housing production in Planning Areas 1 or 2 or within designated centers." 51 N.J.R. at 341. Table H listed the affected designated centers, municipalities, and counties. 51 N.J.R. at 341-42.

Although the DEP did not use the terms "insignificant impact" or "extreme unlikelihood," its determination substantially complied with APA requirements and exempted it from having to estimate the number of housing units affected. In so ruling, we recognize that the DEP should have provided a more complete factual basis for its determination. N.J.A.C. 1:30-5.1(c)(9)(i). Nonetheless, the smart growth development impact statement "provided adequate notice to municipalities and other interested parties" and gave them "an adequate opportunity to submit comments on the issue" in keeping with the goal of impact statements in substantial compliance with the APA. In re N.J.A.C. 5:96 & 5:97, 416 N.J. Super. at 507.

<u>The Opportunity to Submit Comments and Consideration Thereof</u>

The APA requires agencies to "[a]fford all interested persons a reasonable opportunity to submit data, views, comments, or arguments, orally or in writing" and to "consider fully all written and oral submissions respecting the proposed rule . . . ." N.J.S.A. 52:14B-4(a)(3). "If within 30 days of the publication of the proposed rule sufficient public interest is demonstrated in an extension of time for submissions, the agency shall provide an additional 30-day period for the receipt of submissions by interested parties." <u>Ibid.</u>

At the conclusion of the comment period, the agency must prepare, publicly distribute, and make available on its website "a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views, comments, and arguments contained in the submissions." N.J.S.A. 52:14B-4(a)(4).

The record reflects the DEP substantially complied with the APA requirements pertaining to comments. It afforded the public a reasonable opportunity to comment, both orally and in writing, and fully considered all comments. It held a public hearing at which fifty people attended and twenty-four offered oral testimony. It received 1,753 written comments and extended

the written comment period by thirty days to allow additional time for submissions. Its rule adoption contains a comprehensive summary of the comments and the agency's response thereto, organized by topic. 52 N.J.R. at 712-48.

RTMUA, the Township, the County, and Flemington contend that the DEP failed to fully consider comments they and others submitted concerning: (1) Kleinfelder's habitat assessment report, supporting data, and expert opinion regarding the Three Bridges Segment's regulatory eligibility for C1 upgrade; (2) the mapping inconsistencies; (3) the C1 upgrades' impacts on property values and property taxes; and (4) the effect of the 300-foot riparian zones and RTMUA's capacity restrictions on development and redevelopment. We address each claim separately.

## 1. The Kleinfelder Habitat Assessment Report

The record shows the DEP considered and responded to Kleinfelder's conflicting opinion, habitat assessment report, and supporting data when addressing comments 49 through 53, but declined to change its position because the data "was not submitted in accordance with an approved [QAPP]." 52 N.J.R. at 719-20.

In response to multiple comments that asserted "[a]ll six habitat assessments of the segment performed by a third-party found the segment to be of 'suboptimal' habitat," the DEP explained:

> As indicated in the notice of proposal Summary at 51 N.J.R. 318, the Department considers data generated by other entities, including . . . outside stakeholders, who have a [QAPP] approved by the Department, [EPA], or USGS. This data must be submitted pursuant to the data solicitation notice for the development of the Integrated Report. The requirement that data considered be prepared by an entity that has a [QAPP] approved by the Department, [EPA], or USGS ensures that all data are generated following accepted collection and analysis procedures. The Department notes that the data provided by the commenters referenced in Comment 49 was not submitted in accordance with an approved [QAPP] and, therefore, does not qualify for consideration by the Department.

> [52 N.J.R. at 720.]

On appeal, RTMUA does not dispute the fact that Kleinfelder lacked a QAPP approved by the DEP, EPA, or USGS. Rather, it asserts that the DEP had no basis to summarily reject Kleinfelder's comments and should have considered the photographs submitted.

Although the DEP stated in its response that Kleinfelder's report and data did not "qualify for consideration," it did not summarily reject them as RTMUA claims. Ibid. The DEP's comment response shows that it reviewed and

A-3545-19

considered them but ultimately determined that since the data was not collected pursuant to a QAPP approved by the DEP, EPA, or USGS, Kleinfelder's conflicting opinion and supporting data would not dissuade the agency from upgrading the Three Bridges Segment to C1.  Ibid.

Given its technical expertise, it was reasonable for the DEP to rely upon scientific data that is collected pursuant to a QAPP and to exclude data that was not.  See Mercer Cnty. Deer All. v. State Dep't of Env't Prot., 349 N.J. Super. 440, 449 (App. Div. 2002) ("It was clearly within the discretion of the [agency] . . . to determine which of various theories and approaches to adopt."). Moreover, "conflicting opinions generated by responsive comments received during adherence to the procedures mandated by the APA do not require [the agency] to change [its] position."  Animal Prot. League, 423 N.J. Super. at 573. Thus, the DEP's treatment of Kleinfelder's comments, habitat assessment report, supporting data, and opinion in its response to comments "appears to have been reasonable and is entitled to deference" under the circumstances.  Id. at 565.

2. Mapping Inconsistencies

The DEP considered and responded to comments regarding the mapping inconsistencies in substantial compliance with APA requirements when

addressing comments 21 through 32 and 121 through 127. 52 N.J.R. at 716-17, 731-32.

RTMUA, the County, NJBIA, and NJBA asserted in their comments that the proposal failed to identify the HUC 14 areas, tributaries, and NJPDES facilities adjacent to the Three Bridges Segment that would be impacted by the C1 upgrade with proper mapping, claiming that the maps were inconsistent with the proposal's narrative descriptions. The County also cited discrepancies in the DEP's narrative proposal, PDF maps, and GIS file, which it claimed caused confusion and forced it to hire professional consultants and enlist its GIS staff to develop its own maps to fully understand the impact of the C1 upgrades.

The rule adoption states that based upon its receipt of numerous comments indicating that the affected upstream tributaries were not shown on the PDF maps made available prior to publication of the notice of proposal, the DEP "provided GIS layers for the proposed C1 waterbodies and pdf maps of affected upstream tributaries." 52 N.J.R. at 717, 732. The DEP reasoned that, while helpful, maps and GIS data "are not necessary to locate the waterbodies affected by the proposed amendments" because the proposal notice contained "narrative descriptions of each segment proposed for C1 upgrade" which included "both

the upstream and downstream boundaries of each segment" and the narrative descriptions "govern." Ibid.

On appeal, the Township and County argue that a layman "would not be able to discern whether their property was located along a C1 waterway (or its tributaries) based on the narrative descriptions." The DEP took the position, and still maintains, that any mapping inconsistencies were immaterial given the primacy of the narrative descriptions. Although appellants and the business amici may disagree with the DEP's position on this issue, their disagreement does not give rise to an APA violation.

The record reflects that the DEP fully considered and adequately responded to comments about the mapping discrepancies. As part of its robust response, the DEP posted the more detailed, color-coded May 2019 maps that depicted the HUC 14 watershed boundary lines, affected tributaries, municipal and county boundaries, roads, and certain landmarks. 52 N.J.R. at 732. The DEP also significantly reduced the area subject to a C1 upgrade by approximately 149 river miles. 52 N.J.R. at 711, 748.

That said, a better initial approach may have been to provide USGS topographic maps, with added shading illustrating the location and extent of the riparian zones imposed by the proposed C1 designation. Doing so would have

73

provided a clearer picture of the locations affected in relation to tributaries, buildings, and roads, which are all depicted on USGS topographic maps.[9]

### 3. Impact on Property Values and Property Taxes

During the comment period, the Township voiced concerns about the C1 upgrade "trigger[ing] numerous tax appeals . . . and lower ratables" which "will place [it] in a precarious fiscal position and put additional burdens on the Township's taxpayers." It indicated that out of the approximately 9,600 properties in the Township, 1,970 of them will be affected by the 300-foot riparian zone buffer.[10] Similarly, the County asserted that the DEP failed to address the municipality-specific effects that the C1 upgrades would have on the Township, Flemington, the Town of High Bridge, the Town of Clinton, and the Township of Clinton. We are unpersuaded by these contentions.

The record demonstrates that the DEP considered and responded to comments concerning the impact of the C1 upgrades on property values and real

---

[9] We are unpersuaded by DEP's claim during oral argument that it was unable to do so because streams enlarge and change course due to storms. The suggested enhanced mapping could simply indicate that the riparian zones shown were as of a stated date and subject to later change due to natural forces.

[10] The fact that the Township was able to identify the properties affected by the proposed C1 designation undermines its position that the DEP's mapping provided inadequate notice to affected property owners.

estate taxes. 52 N.J.R. at 732-33, 735-36. In short, the DEP replied that it "does not anticipate that the C1 upgrades will significantly impact property values or tax assessments." 52 N.J.R. at 736. Regarding the municipality-specific concerns expressed by the commenters, the DEP replied that "in addition to property owner preferences" about future development of their property, "the extent of any impacts to individual properties is influenced by numerous site-specific factors, making such specific analysis not possible" as it would require speculation. 52 N.J.R. at 733.

The DEP cited a 2006 Connecticut Office of Legislative Research report titled "Impact of Open Space on Property Values" in support of its position that "[t]he vast majority of studies examining the relationship between property values and proximity to greenery, wildlife, outdoor recreation, and other amenities of undeveloped natural lands show that, where any impacts exist, they tend to be positive." 52 N.J.R. at 736. Consistent with that report, the DEP reasoned that while "the extent of any impacts to individual properties is influenced by numerous site-specific factors," the "maintenance of the[] protected riparian zones could foreseeably improve the values of nearby properties, thus counteracting negative influences on property value." 52 N.J.R. at 733, 736.

The Township and County contend that the report cited by the DEP and contained in the record is irrelevant because it "essentially concluded that property values may increase if they are located near public parks." While the report is basically a short synopsis of other published studies, it bears some relevance to the issues raised here. It not only discusses the economic impact of public parks on property values as the Township and County contend, but also the more general positive economic impact of protecting rivers, trails, greenway corridors and "open space" on property values.

We find that the DEP adequately considered and responded to the comments pertaining to the proposal's expected impact on property values and property taxes in substantial compliance with the APA.

### 4. Effect of Riparian Zones and RTMUA's Capacity Restrictions on Development and Redevelopment

The DEP considered and responded to comments, in substantial compliance with APA requirements, pertaining to the effect of the 300-foot riparian zones and RTMUA's capacity restrictions on planned development and redevelopment. It addressed these issues at length under the headings "Economic Impacts of the Notice of Proposal," 52 N.J.R. at 732-36, "New Jersey Pollutant Discharge Elimination System (NJPDES)-Related Impacts," 52 N.J.R. at 737-38, "NJPDES Impact Assessment," 52 N.J.R. at 739-40, "Impacts to

Sewer Service Areas," 52 N.J.R. at 741, "Clarifications Regarding the 300-foot Riparian Zone," 52 N.J.R. at 743-44, and "State Planning Act; State Development and Redevelopment Plan (SDRP)," 52 N.J.R. at 746-47.

Flemington contends on appeal that the DEP failed to address its comments regarding how the capacity restrictions imposed on RTMUA's main facility will affect development and redevelopment projects in the Borough.

Flemington, "a designated Opportunity Zone[11] . . . specifically recognized as an area where long-term investment and growth should be encouraged," commented that it sought to achieve "long term fiscal sustainability through the revitalization of its downtown and surrounding areas" but that the restrictions to be imposed upon RTMUA would constrain development and redevelopment. It also cited its goals to make infrastructure improvements aimed at reducing flooding but noted that the improvements will not be "fiscally sustainable" without "development and redevelopment within the Borough."

In response, the DEP acknowledged that Flemington was both an Opportunity Zone and a Designated Center under the SDRP, but determined that

---

[11] The "Opportunity Zones program" is designed to encourage long-term capital investments in low-income rural and urban communities. 52 N.J.R. at 735.

the Borough was "unlikely to be affected" by the C1 upgrades because the boundary change to the Three Bridges Segment meant that it would not be subject to the 300-foot riparian zone. 52 N.J.R. at 734, 747. The DEP also found that the C1 upgrades "are consistent with and support the SDRP." 52 N.J.R. at 747.

On the RTMUA capacity issue, the DEP explained that is not impossible for Flemington or other municipalities to obtain new sewer service for development or redevelopment projects from RTMUA, even with the C1 upgrade's "no measurable change" requirement. 52 N.J.R. at 738-41. For one thing, water "treatment and dilution may allow for some measure of additional loading" by RTMUA's main plant with "no measurable change in water quality" due to the "reserve capacity" already allocated into the Total Maximum Daily Load (TMDL). 52 N.J.R. at 738. The reserve capacity is included "due to the potential for additional development in the watershed." Ibid.

In addition, "RTMUA may also increase discharged flow, as long as the allocated total phosphorous loads stay within the waste load allocations assigned by the TMDL, however the RTMUA must assess the impact of other substances to downstream C1 segments." Ibid. In other words, because there are C1 waters located downstream of RTMUA's outfall, it can obtain a permit "for a new or

expanded wastewater discharge" so long as existing water quality is maintained. 52 N.J.R. at 738-39, 741.

RTMUA maintains, without providing an estimate of the anticipated costs, that compliance with the antidegradation provisions for increased flow is essentially "cost prohibitive" such that it "will be unable to increase its capacity" for Flemington and other customers. 52 N.J.R. 738. "A successful challenge to the regulations implementing the agency's chosen course will require more than just a showing 'that compliance with the regulations may be expensive.'" In re N.J.A.C. 7:27-27.1, 392 N.J. Super. 117, 136 (App. Div. 2007) (quoting In re N.J.A.C. 7:27-16, 244 N.J. Super. 334, 344-45 (App. Div. 1990)).

In sum, the record reflects that the DEP substantially complied with the APA by considering and responding to all comments. The parties' disagreement with the DEP's response to issues they raised during the public comment period fails to rebut the presumption that the agency substantially complied with the APA. See N.J.S.A. 52:14B-5(d) ("The filing of a certified copy of any rule shall be deemed to establish the rebuttable presumption[] that . . . all requirements of [the APA] and of interagency rules of the director relative to such rule have been complied with . . . ."). We find that the DEP substantially complied with the

APA's procedural requirements pertaining to notice, impact statements, and comments when adopting the amendments to N.J.A.C. 7:9B.

The C-1 Antidegradation Classification

RTMUA contends that the upgraded C1 designation for the Three Bridges Segment was arbitrary, capricious, and unreasonable because it was not supported by credible data, and contradicts the DEP's identification of the entire subwatershed as "impaired" in a subsequently adopted water quality assessment report that is not part of the record. The Business amici curiae support RTMUA's contentions.

The DEP contends the C1 classification was supported by reliable data and analysis. The Environmental amici curiae express support for the DEP's reliance upon habitat assessment data collected by, among others, volunteer "citizen scientists" trained and supervised by RHA. They also generally support the upgraded C1 designation and the environmental protections it provides to downstream communities' water quality.

A. The Habitat Assessment Data

Relying upon the opinion of its expert, RTMUA claims that the DEP's determination that the segment at issue supports an optimal habitat is not

supported by "credible data" and criticizes the DEP's reliance upon data collected by RHA's "scientifically untrained volunteers."  We disagree.

"While there may be disagreements as to available data and its interpretation, . . . [reviewing courts] defer to agency findings that are based on sufficient evidence in the record."  Animal Prot. League, 423 N.J. Super. at 554.  Agency rules are "not improper merely because there was disagreement among the experts as to the means, methods and conclusions of the applicable science."  Id. at 562.  "[T]he critical inquiry [is] whether the [agency's] decision was based on scientific knowledge and investigation."  Ibid.

As noted, Kleinfelder opined that because monitoring station SB07 was rated "suboptimal" from 2012 through 2015 and only rated "optimal" in 2016 and 2017, "the segment should be considered suboptimal"; and that because monitoring station SB08 was located downstream of the segment's endpoint, its "optimal" rating was irrelevant.  In response, the DEP asserts that it appropriately relied upon "the most recent data points available" from SB07.  As for SB08, the DEP acknowledges that it is located downstream from the segment at issue but explains that "[b]ecause water and sediment travel downstream," SB08's rating "simply confirms SB07's rating."

The optimal ratings at SB07 from 2016 and 2017, obtained via scientific assessment and investigation, support the DEP's determination that the segment at issue supports an optimal habitat. 51 N.J.R. at 325, 331. RTMUA has not cited anything in the record or regulations that requires the DEP to collect data from more than one monitoring station within the stream segment to support an optimal habitat rating. Similarly, RTMUA has not cited anything that prohibits the DEP from considering data collected from a downstream monitoring station for the purpose of confirming an upstream monitoring station's rating. We find no such prohibitions.

The DEP's amended Statement of Items Comprising the Record contains website links to a plethora of scientific reports and supporting data, most of which were not submitted in hard copy in any of the parties' appendices. One such report states generally that "[d]ata from one or more monitoring stations located within a given assessment unit are used to evaluate water quality within that assessment unit's boundaries." N.J. DEP'T OF ENV'T PROT., DIV. OF WATER MONITORING & STANDARDS, BUREAU OF ENV'T ANALYSIS, RESTORATION AND STANDARDS, 2016 NEW JERSEY INTEGRATED WATER QUALITY ASSESSMENT

METHODS DOCUMENT 23-24 (2017).[12]  This suggests that reliance upon data from a single monitoring station is sufficient under the DEP's protocols.

In any event, the selection of monitoring stations is well within the DEP's technical expertise and is entitled to deference.  See Mercer Cnty. Deer All., 349 N.J. Super. at 449 ("It was clearly within the discretion of the [agency] . . . to determine which of various theories and approaches to adopt.").  Plus, the DEP asserts that monitoring stations are selected "in accordance with NJDEP's Integrated Report data solicitation notice" and that "the formation of [the] Integrated Report includes a public comment period."  In other words, RTMUA and others had an opportunity to submit comments on any issues pertaining to the monitoring stations in connection with the finalization of the Integrated Report had they desired to do so.

Furthermore, the fact that Kleinfelder's own data collection and analysis, which was not done pursuant to a QAPP approved by the DEP, EPA, or USGS, yielded a suboptimal rating for the segment at issue does not detract from the credibility of the DEP's supporting data.  As we have noted, "simple disagreement, even if based on contradictory expert opinions, is insufficient to

---

[12]  Bureau of Env't Analysis, Restoration & Standards, N.J. Dep't of Env't Prot., 2016 New Jersey Integrated Water Quality Assessment Methods 23-24 (2017).

overcome the presumption of reasonableness ascribed to [the agency's] findings."  Animal Prot. League, 423 N.J. Super. at 562.

Finally, RTMUA's objection to the DEP having considered data samples collected by "untrained" RHA volunteers is unfounded.  The record reflects that "RHA staff train volunteers annually on macroinvertebrate collection and visual habitat assessment to determine a watershed's health."  52 N.J.R. at 720.  The record supports the conclusion that the benthic macroinvertebrate samples and habitat data they gather is collected in accordance with a QAPP approved by the DEP and EPA's "Citizen Science Coordinator to assure high quality data."  51 N.J.R. at 316; 52 N.J.R. at 720.  For these reasons, the DEP was "confident in using the RHA data to upgrade waterbodies to C1 designation."  52 N.J.R. at 720.

It is well within the DEP's discretion to determine what scientific data it will rely upon to support its decision-making.  See Mercer Cnty. Deer All., 349 N.J. Super. at 449.  Additionally, given the fact that the DEP only collects its own data samples once every five years per region on a rotating schedule, its reliance on the data collected annually by RHA enables it to consider the most recent publicly available data when determining whether waterbody segments

are eligible for upgrade to C1 status.  This is a reasonable approach that is entitled to the court's deference.  <u>Animal Prot. League</u>, 423 N.J. Super. at 565.

Contrary to RTMUA's claims, the EPA does not require data collection to be conducted by biologists.  Indeed, the EPA RBP cited by Kleinfelder contains citations to a published EPA document titled "Volunteer Stream Monitoring: A Methods Manual," described as "guidance for citizen monitoring groups to use biological and habitat assessment methods for monitoring streams.  These methods are based in part on the RBPs."[13]  This plainly suggests the EPA contemplates the use of trained volunteers involved in organizations such as RHA to collect data samples for habitat assessments.

Of note, the Environmental amici, including RHA, refute RTMUA's contention that the use of trained volunteers, rather than biologists to obtain data used in habitat quality assessment, results in unreliable data.  Community Water Monitoring (CWM) is a recognized method of acquiring needed water quality data utilized by the DEP.[14]  Among other things, Environmental amici describe

---

[13]  Office of Water, U.S. Env't Prot. Agency, EPA 841-B-99-002, <u>Rapid Bioassessment Protocols for Use in Wadeable Streams and Rivers:  Periphyton, Benthic Macroinvertebrates, and Fish</u> 2-4 (2d ed. July 1999).

[14]  According to the DEP, CWM is "the collection of scientific water quality data by concerned citizens working in partnership with professional scientists and

how RHA trains its volunteers to ensure the collection of reliable data pursuant to the approved QAPP, explain that RHA has biologists and other scientists on staff who oversee the stream monitoring program, and note that the data samples are not analyzed or scored by volunteers but by biologists at Normandeau Associates, an independent laboratory located in Pennsylvania.

---

government decision-makers.  This valuable data helps determine the ecological condition of local waterbodies as well as identify the causes and sources of water quality impairment."  Community Water Monitoring, NJDEP, https://www.state.nj.us/dep/wms/bears/comm_water_monitoring.htm (May 11, 2020).  "Community water monitoring includes both 'citizen science' and 'volunteer monitoring' activities."  Ibid.  CWM is used to collect data regarding the physical conditions, chemical characteristics, and biological conditions of local waterbodies.  Ibid.  As explained by the DEP, "[h]igh quality data collected by citizen scientists and volunteer monitors can help supplement data collected by environmental professionals and can assist scientists, policy makers, and resource managers make more informed decisions that protect New Jersey's waterways."  Ibid.  To that end, "[d]ata that has met specific quality requirements in accordance with a [QAPP] . . . can be used by the [DEP] to assess water quality . . . ."  Ibid.  The use of data collected by citizen scientists in scientific studies is not novel.  Peer-reviewed scientific studies routinely rely on data collected by citizen scientists.  See e.g., George Wyeth et al., The Impact of Citizen Environmental Science in the United States, 49 Env't L. Rev. 10237 (2019); Kristine F. Stepenuck & Linda T. Green, Individual- and Community-Level Impacts of Volunteer Environmental Monitoring: A Synthesis of Peer-Reviewed Literature, 20 Ecology and Soc'y, no. 3, Sept. 2015, art. 19.  As noted by Environmental amici, New Jersey is not alone in relying on citizen scientist collected visual habitat assessment data to inform its regulatory water quality assessments.  This is hardly surprising as the EPA authorizes the use of external data by allowing state agencies to "assemble and evaluate all existing and readily available water quality-related data and information."  EPA Water Quality Planning and Management, 40 C.F.R. § 130.7(b)(5).

A-3545-19

In sum, the voluminous record demonstrates that the DEP's C1 designation of the segment at issue was based upon substantial credible evidence, procured through scientific knowledge and investigation, and was therefore reasonable.

B. The Alleged "Impaired" Classification of the Entire Subwatershed

RTMUA contends that because the subwatershed in which the Three Bridges Segment is located appeared on the DEP's 2016 303(d) List of Impaired Waters, the segment did not qualify for C1 designation.

Only the DEP's draft version of the 2016 Integrated Report (which includes the 2016 303(d) List) appears on the amended Statement of Items Comprising the Record. However, we may take judicial notice of "determinations of all governmental subdivisions and agencies thereof." N.J.R.E. 201(a). The 303(d) List is referenced generally in the notice of proposal. 51 N.J.R. at 317. We take judicial notice of the final version of the 2016 303(d) List. N.J.R.E. 202(b).

On September 16, 2019, the DEP published a Public Notice in the New Jersey Register requesting comments on the draft 2016 303(d) List, after the comment period in this instant matter had already concluded. 51 N.J.R. 1477(a) (Sept. 16, 2019). Following a month-long comment period, the DEP revised the draft and submitted the final List to the EPA for approval on January 2, 2020,

two months before its adoption of the SWQS amendments on March 4, 2020. 52 N.J.R. 1971(a) (Oct. 19, 2020).  The EPA approved the final 2016 303(d) List on January 23, 2020.  Ibid.  The 2016 303(d) List, along with the entire 2016 Integrated Report, is available on the DEP's website.  Ibid.

On October 19, 2020, after the rulemaking in this matter had concluded, the DEP published a Public Notice of "Adoption of New Jersey's 2016 303(d) List of Water Quality Limited Waters."  Ibid.  The notice explained that the DEP is required to develop, as part of the biennial Integrated Report, the 303(d) List which includes "waters that currently do not meet, or are not expected to meet, applicable water quality standards after the implementation of technology-based controls."  Ibid.

The DEP does not dispute that the subwatershed in which the Three Bridges Segment is located appears on the 2016 303(d) List.  However, it contends that the 303(d) List "has no bearing here" because it was published after the rulemaking process at issue concluded.  It also asserts that the List relied on older data (generated between January 2010 and July 2015) rather than the newer data relied on to support the SWQS amendments.  Furthermore, the DEP argues that even though the subwatershed appears on the 303(d) List, that

fact alone does not preclude the segment at issue from satisfying the regulatory criteria for a C1 upgrade.

Under the regulations, C1 waters are protected from any measurable change to existing water quality when deemed to have exceptional ecological significance, exceptional recreational significance, exceptional water quality significance, or exceptional fisheries resources. N.J.A.C. 7:9B-1.4. Here, the DEP sought to upgrade the Three Bridges Segment "based upon [its] exceptional ecological significance as [it supports] an exceptional aquatic community."[15] 51 N.J.R. at 324-25. We have noted the criteria for a nonimpaired benthic macroinvertebrate community to establish that a waterbody supports an exceptional aquatic community under N.J.A.C. 7:9B-1.4. See supra at 22-25 (discussing nonimpaired benthic macroinvertebrate community and optimal instream habitat).

"A 'regulation should be construed in accordance with the plain meaning of its language and in a matter that makes sense when read in the context of the entire regulation.'" J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 214 (2019) (quoting Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div. 1985)). A reviewing court

---

[15] See N.J.A.C. 7:9B-1.4 (defining "exceptional ecological significance").

"cannot rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning. In short, [the court] must construe the regulation as written." U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012) (internal citation omitted).

As explained in the proposal, the DEP cited the segment's optimal instream habitat and low percentage of impervious surface as the two required supporting factors. 51 N.J.R. at 325. It did not rely upon water quality data, nor was it required to by the plain language of N.J.A.C. 7:9B-1.4. Indeed, the DEP explained in the proposal:

> Under the exceptional aquatic community part of the "exceptional ecological significance" definition, if water quality data indicates an exceedance for dissolved oxygen, temperature, total phosphorous, or total suspended solids, the ecological value is not considered exceptional and cannot be used as part of the justification for Category One antidegradation designation based on exceptional ecological significance . . . .
>
> [51 N.J.R. at 317.]

Under the plain language of the regulatory scheme set forth in N.J.A.C. 7:9B-1.4, supporting water quality data is not needed to support a C1 upgrade based upon exceptional ecological significance as demonstrated by an exceptional aquatic community so long as the waterbody supports at least two

of the following factors: an optimal habitat, an excellent fish community, or a low percentage of impervious surface. The record demonstrates that the segment in question meets that standard.

While the standard may seem to the untrained eye to be internally inconsistent, "a reviewing court 'will not substitute its judgment for the expertise of the agency.'" J.H., 239 N.J. at 214 (quoting Dougherty v. Dep't of Hum. Servs., 91 N.J. 1, 6 (1982)). RTMUA has not established that the DEP's interpretation of N.J.A.C. 7:9B-1.4 is "plainly unreasonable." Commc'n Workers of Am., AFL-CIO v. N.J. Civ. Serv. Comm'n, 234 N.J. 483, 515 (2018) (discussing the "substantial deference" owed to a government agency's interpretation of its regulations). On the contrary, the DEP's interpretation of N.J.A.C. 7:9B-1.4 is supported by the plain language of the regulation.

In sum, we find that the DEP's C1 antidegradation designation for the Three Bridges Segment is supported by substantial credible evidence in the record and consonant with applicable statutes and regulations. We further find that the adoption of the SWQS amendments complied with APA requirements. The due process rights of property owners impacted by the amendments were not violated. Accordingly, we reject appellants' claims that the amendments are arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3545-19